977 F.2d 583
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
William C. ENGLE (91-5967), Ricky D. Dobson (91-5978),
Defendants-Appellants.
 Nos. 91-5967, 91-5978.
 United States Court of Appeals, Sixth Circuit.
 Oct. 7, 1992.
 
 Before DAVID A. NELSON and ALAN E. NORRIS, Circuit Judges, and JOINER, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 Defendants Ricky Dobson and William Engle appeal their drug trafficking convictions. Dobson was convicted of conspiracy to possess with intent to distribute marijuana, aiding and abetting, and knowingly using a firearm during and in relation to a drug trafficking crime. Engle was convicted on only the conspiracy count, and challenges the sufficiency of evidence to convict him and the sentencing judge's refusal to decrease his base offense level on the basis of his claimed minimal or minor role in the offense. Dobson challenges the search of his vehicle in which a gun was found, reliance upon guns found in another defendant's car to convict him of the firearm charge, the jury instruction that "use" included opportunity to use a gun, and allegedly duplicitous language in his indictment. Both defendants challenge the basing of the sentencing guideline level on the drug quantity negotiated rather than the quantity actually bought. Concluding that these claims lack merit, we affirm.
 
 I.
 
 2
 A police investigation of defendants' conduct was triggered by a meeting between a confidential informant and Kentucky State Police Detective Ronnie Ray. The informant indicated he knew of people trying to purchase large quantities of marijuana. Following this tip, Ray, working undercover, received a call on September 16, 1990 from John Stacy, who expressed an interest in buying up to 200 pounds of marijuana. Ray spoke with Stacy several times over the telephone about the purchase, recording each of these conversations. On September 21, Stacy met with Ray who displayed high and low grade samples of marijuana. Stacy said he was interested in purchasing as much of the better grade, $1,000 per pound, of marijuana as Ray could supply. In subsequent recorded telephone conversations with Ray, Stacy indicated he would also buy all of the lesser grade, $750 per pound, of marijuana as Ray could provide. Detective Ray told Stacy he could probably come up with 100 pounds of the better grade and 200 pounds of the lower grade. On October 10, Ray called Stacy twice to make final arrangements for the transaction. In these conversations, which were recorded, Stacy mentioned that he needed to consult other individuals before consummating the deal. A meeting at a local restaurant was set for October 11, 1990.
 
 
 3
 At that meeting, Detectives Ray and Dave Mirus entered the restaurant and saw Stacy sitting with two men later identified as Dobson and Engle. Ray had not met defendants previously. After Stacy introduced Dobson and Engle, the five men went outside to Stacy's vehicle to negotiate. Stacy and Dobson displayed several thousand dollars and Stacy told Ray that they wanted to see a sample of the marijuana. Dobson and the two detectives went to Ray's van, where Dobson was shown and approved a sample of the better grade of marijuana. When the men returned to Stacy, he indicated he wanted to purchase fifty pounds that day, and fifty pounds each following day until 300 pounds of marijuana had been purchased. He said he did not want to carry around the money required to buy all the marijuana at one time. The men agreed to this arrangement and the sale was to be consummated that evening. Stacy, Dobson, and Engle left together, in Stacy's vehicle.
 
 
 4
 That afternoon, Stacy confirmed the meeting with Ray by phone and said that he had gotten the money together. Detectives Ray and Mirus arrived at the meeting site at 7:30 that evening and Stacy, Dobson, and Engle met them in the parking lot next to a Cadillac which Stacy had driven. Stacy told the detectives that he had been able to come up with only $39,000 because his bank had closed before he could withdraw the remaining $11,000. Ray agreed to sell thirty-nine pounds and asked to see the money.
 
 
 5
 Ray was then taken by Dobson to his Trans Am automobile. The two men entered the car, and Dobson pulled out a bag of cash from the jacket he was wearing and indicated it covered his part, $20,000. Ray inspected the money and returned it to Dobson. The two then returned to the Cadillac where the other three men were still standing.
 
 
 6
 While Ray and Dobson were inside the Trans Am, Stacy asked Mirus about the possibility of transporting the marijuana for them. Mirus acted agreeable to the offer and noted it would probably be a good idea to use a rental car. Mirus testified that Engle endorsed this suggestion and indicated that if things got "hot," the vehicle could be easily abandoned.
 
 
 7
 When Ray and Dobson returned, Stacy and Ray entered the Cadillac and Stacy opened the glove box to reveal several thousand dollars. Stacy added another $2,000 from his pocket. Ray inspected the money and returned it to the glove compartment. Ray and Stacy then returned to the other men. While Ray and Dobson were in the Cadillac, Detective Mirus testified that he asked Engle if he was "just along for the ride." Engle responded that he usually sold the marijuana for Stacy and Dobson. Shortly after Ray and Dobson returned to the group, ten to fifteen police officers arrived.
 
 
 8
 Following their arrest, Stacy, Dobson, and Engle were searched and secured in a police vehicle. The police found a .38 caliber bullet in Dobson's pocket, and the $20,000 Dobson had shown to Ray earlier. The police also searched the Cadillac and found $19,000 in the glove compartment, a loaded Smith and Wesson .357 magnum revolver and a loaded Rossi .38 caliber handgun on the floor under the driver's seat. The police also found a .38 caliber bullet in Engle's pocket which matched bullets removed from the Rossi. They also searched the passenger compartment of Dobson's Trans Am, which was parked at least two parking spaces distant from the Cadillac where the men had been arrested. They discovered a loaded Colt .38 caliber handgun in a pouch under the driver's seat.
 
 II.
 
 9
 Engle was convicted of conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846, and was sentenced to thirty-three months' imprisonment. He appeals several decisions of the trial court affecting his conviction and sentence.
 
 A. Sufficiency of the Evidence
 
 10
 Engle argues that the evidence was insufficient to convict him of conspiracy because he was merely an "interested spectator." At trial, he moved for a judgment of acquittal following both the government's case and the close of all the evidence. Both motions were denied. Engle notes that it was Stacy who organized the deal and conducted all the negotiations. Stacy and Dobson drove the cars and displayed the purchase money. Engle, on the other hand, had no money with him, did not drive to either of the meetings, and was largely silent throughout the meetings.
 
 
 11
 The standard of review for a challenge to the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Martin, 920 F.2d 345, 348 (6th Cir.1990), cert. denied, 111 S.Ct. 2038 (1991). Engle was present both at the meeting setting up the transaction and at the transaction itself. He was aware from the morning meeting what would occur that evening. Detective Mirus testified that Engle, after being asked if he was "just along for the ride," told him that he sold marijuana for Dobson and Engle. This comment clearly indicated a history of drug involvement between Engle and the others, and his presence on the day of arrest could indicate to a jury his continuing desire to be involved in the drug trafficking. In addition, Mirus testified that Engle agreed that it was a good idea to use a rental car in the transportation of the marijuana, and added that the car could easily be abandoned if the driver got into trouble. A jury could interpret such comments as evidence of an insider's sophisticated knowledge of drug trafficking.
 
 
 12
 Engle's connection to the conspiracy "need only be slight. He need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement." United States v. Hodges, 935 F.2d 766, 773 (6th Cir.), cert. denied, 112 S.Ct. 251 & 317 (1991). While mere presence during a crime is insufficient to convict someone of conspiracy, "presence is a material and probative factor which the jury may consider in reaching its decision." Id. From Engle's repeated presence during drug trafficking negotiations and his statement regarding his position and knowledge of the operation, a reasonable jury could find that Engle's participation went beyond "mere presence."
 
 
 13
 B. Sentencing-Reduction for Minimal or Minor Participation
 
 
 14
 Engle also asserts that the district court erroneously denied him a reduction in his sentence in view of his minimal or minor role in the conspiracy. A defendant's sentence may be reduced:
 
 
 15
 (a) If the defendant was a minimal participant in any criminal activity, decrease [offense level] by 4 levels.
 
 
 16
 (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
 
 
 17
 In cases falling between (a) and (b), decrease by 3 levels.
 
 
 18
 United States Sentencing Commission, Guidelines Manual § 3B1.2 (Nov. 1991). The minimal role reduction applies to "defendants who are plainly among the least culpable of those involved in the conduct of a group," and the defendants' lack of knowledge or understanding of the scope and structure of the enterprise "is indicative of a role as minimal participant." U.S.S.G. § 3B1.2, comment. (n. 1).[2] A minor participant is one who is "less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n. 3).
 
 
 19
 The district court's determination is reviewed for clear error. United States v. Perry, 908 F.2d 56, 58 (6th Cir.), cert. denied, 111 S.Ct. 565 (1990). Engle's statement to Detective Mirus that he "usually sold the marijuana" indicates that his role involved more than a single transaction. The district court concluded that "a lot of smart drug dealers let other people carry the money ... and measure the dope. A lot of smart drug dealers don't do a lot of talking." Given Engle's participation at both meetings, including his interest in the method of transporting the marijuana and his acknowledgement that he was involved in past sales, we cannot say that the judge's determination was clearly erroneous. We therefore affirm Engle's sentence as it applies to his level of participation.
 
 C. Election of Drug Quantity Charged
 
 20
 Prior to trial, Engle asked the district court to require the government to elect the guideline level it believed was applicable to the charge against him, since he theorized that quantity is an essential element of the offense and he was entitled to have a jury determine the amount involved. The longstanding rule in this circuit, however, has been that the drug amount is not an element of the offense, but instead is relevant to punishment and is left to the court at sentencing for determination by a preponderance of the evidence. Hodges, 935 F.2d at 770; United States v. Sawyers, 902 F.2d 1217, 1219 (6th Cir.1990), cert. denied, 111 S.Ct. 2895 (1991).
 
 III.
 
 21
 Dobson was convicted of conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846, and with aiding and abetting and knowingly using a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1) and (2). He was sentenced to twenty-seven months' imprisonment for the conspiracy and sixty months for the firearm count, to run consecutively. He appeals several decisions of the trial court during the trial and sentencing.
 
 
 22
 A. Motion to Suppress Results of Post-Arrest Search of Car
 
 
 23
 Dobson filed a pretrial motion to suppress evidence of the pistol seized from his Trans Am during the warrantless search following his arrest. The district court overruled that motion, and another made at trial, after hearing the voir dire testimony from one of the detectives involved in the arrest. The court indicated that it was a lawful search incident to an arrest.
 
 
 24
 Dobson argues that the search was unlawful because he was not an occupant of the car at the time of his arrest. Dobson notes that he was arrested while standing next to Stacy's Cadillac, which was located at least two parking spaces distant from his car. He concedes that at one point during the transaction he was in the Trans Am with Detective Ray, but argues that at least ten minutes had elapsed by the time of the arrest. He claims he could not have had access to the car so as to endanger the police or destroy evidence, since he was placed prone on the pavement and his hands were handcuffed behind him, and was then searched and placed in the rear compartment of a police cruiser and locked inside while still handcuffed. He says there were at least eleven police officers participating in the arrest of the three men.
 
 
 25
 In New York v. Belton, 453 U.S. 454 (1981), the Supreme Court held that warrantless searches of the passenger compartment of an automobile, and any containers found there, are valid under the Fourth and Fourteenth Amendments as a contemporaneous incident of lawful custodial arrest of the occupant. In the Belton case, police had stopped a car for excessive speed and arrested the occupants after observing evidence of marijuana possession. The men were taken away from the car and the car was searched. A packet of cocaine was found in a jacket pocket in the back seat. The Supreme Court concluded that evidence of the cocaine need not be suppressed because "when a police [officer] has made a lawful custodial arrest of the occupant of an automobile, [the officer] may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." Id. at 460.
 
 
 26
 According to Dobson, Belton does not validate the search of his car because, unlike the defendant in Belton, he was not arrested while an occupant of the car. He points to Chimel v. California, 395 U.S. 752 (1969), as supporting his argument that the search of his car was not a lawful search incident to a valid arrest. Chimel, which predates Belton, held that a law officer may search the immediate area within an arrestee's control. The Court specifically defined the area of a justifiable search as "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence." Id. at 763.
 
 
 27
 This court considered similar circumstances in United States v. White, 871 F.2d 41 (6th Cir.1989). In White, the defendant was driving erratically and was pulled over by a police officer. He exited his car, and repeatedly failed a field sobriety test. The police officer decided to take him to the police station for a breathalyzer exam, and he was placed under arrest, handcuffed, and put into the rear seat of the police cruiser. The officer then searched the front seat of defendant's car and discovered a gun. The district court granted the defendant's motion to suppress evidence of the firearm.
 
 
 28
 The specific question addressed in White on appeal was "whether the Belton rule applies even when the arrestee is out of reach of the car and its contents." Id. at 44. This court reversed the district court and determined that discovery of the gun was the product of a valid search incident to arrest. Id. at 43. We noted that in Belton the defendants had been asked to "get out of their car, arrested, patted down, and split ... up into four spearate areas of the Thruway...." Id. at 44 (citations omitted). This court concluded that "even after the arrestee has been separated from his vehicle and is no longer within reach of the vehicle or its contents, the Belton rule allowing a police officer to search a vehicle incident to a lawful arrest applies, and such a search is valid." Id. As long as the area being searched "had been within the suspect's control before he was removed from the [vehicle]," the search is valid. Id. (emphasis in original). The opinion noted that "our consistent reading of Belton has been that, once a police officer has effected a valid arrest, that officer can search the area that is or was within the arrestee's control." Id. (emphasis in original).
 
 
 29
 Our holding in White is dispositive of the issue in this case. Since an officer can clearly search the area that was within the arrestee's control prior to his arrest and immobilization, we see no reason to distinguish cases in which the arrestee was actually arrested while occupying the car and then taken elsewhere, from a case in which the arrestee had recently been in the car but was not arrested until he had left the car. Any alleged disparity in facts between White and the case at issue is a distinction without a difference. Therefore, we affirm the district court's denial of the motion to suppress.
 
 
 30
 B. Relationship of the Firearms to the Drug Crime
 
 
 31
 Count II charged that Stacy, Engle, and Dobson
 
 
 32
 aided and abetted by each other, knowingly used a firearm, to wit, a .380 caliber Colt pistol, a .357 caliber, Smith & Wesson revolver, and .38 caliber Rossi revolver, during and in relation to a drug trafficking crime ... to wit, to attempt to possess and conspire to possess with the intent to distribute marijuana.... All in violation of [18 U.S.C.] §§ 924(c)(1) and (2). (Emphasis added.)
 
 
 33
 18 U.S.C. § 924(c)(1) provides that "[w]hoever, during and in relation to any ... drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime ... be sentenced to imprisonment for five years." As part of the jury instructions, the court read § 924(c)(1) to the jury, but deleted any reference to "carries" because that term was not included in the indictment. In addition, the judge instructed the jury that:
 
 
 34
 The essential element [sic] required to be proven beyond a reasonable doubt are:
 
 
 35
 ....
 
 
 36
 Second, that during or in relation to the crime alleged in count one, the defendant did knowingly use a firearm.
 
 
 37
 ....
 
 
 38
 It is not necessary for the [government] to prove that the defendant actually displayed or discharged a firearm. It is required, however, that the [government] prove beyond a reasonable doubt that the defendant had a firearm within his possession or control and that such possession or control gave the defendant the opportunity or ability to display or discharge the firearm either to protect himself or to harm or intimidate another person. (Emphasis added.)
 
 
 39
 Dobson objected to the last sentence of this instruction asserting that the jury could convict him for merely having the gun available, even if it determined that he did not intend that the gun would be used as part of the drug trafficking offense. Dobson argues that the instruction prohibited the jury from considering whether he intended to use the gun,[3] and permitted it to convict him for mere possession of the gun because possession gave him the "opportunity" to use it. Dobson requested, instead, that the instruction define "uses a firearm" as "having a firearm, or firearms, available to assist or aid in the commission of the crime alleged," language taken from Federal Jury Practice and Instruction, Devitt, Blackmar and O'Malley § 36.20 (1990). He argues that because mere "opportunity to use" the gun was sufficient for a conviction, the court's instructions relieved the government from the burden of proving that he had the gun in order to facilitate the drug crime.
 
 
 40
 In our opinion, there is really no substantive difference between the instruction given by the judge, and the instruction requested by Dobson. "We review jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." United States v. Williams, 952 F.2d 1504, 1512 (6th Cir.1991). "A district court's refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the ... defense." Id. The court's instruction required the jury to find that Dobson "knowingly" used the firearm. Although counsel complained that the court instead should have required the jury to find Dobson intended to use the firearm, his proffered instruction did not include such a requirement. By his objection lodged in the district court, Dobson was arguing that specific intent was an element of the crime. That argument was rejected by this court in United States v. Brown, 915 F.2d 219, 224 (6th Cir.1990), and it is of no assistance to his cause for Dobson to attempt to recharacterize his objection in terms of "general" intent.
 
 
 41
 Accordingly, the instruction adequately explained the elements of the case. The jury was not required to find that Dobson would use the gun if the situation arose, but did demand that the jury find that he had the gun available to facilitate the drug crime.
 
 
 42
 Secondly, Dobson argues that the evidence was insufficient to link him to the two guns which were found in Stacy's Cadillac. He argues that he was never in the Cadillac, and did not encourage or advise Stacy or Engle to use the guns found in the Cadillac. Dobson asked the district court for a judgment of acquittal on the firearm charge as it related to the guns found in Stacy's car. In the alternative, he requested a special jury verdict stating that the firearm conviction was based upon the gun in his own car, and an instruction that the decision as to which gun he was being convicted on must be unanimous. The district court denied the motions. Dobson contends that because the evidence was insufficient to link him to the guns in the Cadillac, and it is unclear upon which guns the jury based its verdict, the conviction should be vacated and a new trial ordered only as to the gun found in the Trans Am.
 
 
 43
 To be guilty of aiding and abetting, "a defendant must have associated with the criminal venture and participated in the criminal venture." United States v. Hughes, 891 F.2d 597, 599 (6th Cir.1989). Dobson was convicted of conspiracy in a drug trafficking crime. As noted above, actual physical possession is not required under § 924(c)(1). United States v. Acosta-Cazares, 878 F.2d 945, 952 (6th Cir.), cert. denied, 493 U.S. 899 (1989). "Section 924(c)(1) reaches the possession of a firearm which in any manner facilitates the execution of a felony." Id. (citations omitted); United States v. Christian, 942 F.2d 363, 366 (6th Cir.1991), cert. denied, 112 S.Ct. 905 (1992).
 
 
 44
 The weapons in Stacy's car could easily have been used to cover Dobson during the drug transaction. In addition, most of the conversation which occurred during the drug transaction occurred near the Cadillac, and Dobson had easy access to the guns found in that vehicle. From this evidence, a jury could reasonably infer that Dobson both associated with and participated in the availability of Stacy's guns during the drug crime. The district court properly denied Dobson's motion for judgment of acquittal.
 
 
 45
 Since all of the guns were deemed to have been used in the drug trafficking conspiracy, the district judge was not required to submit a special verdict for to the jury in order that it would be required to make a special finding concerning the specific firearm with which Dobson was involved. Cf. United States v. Theodoropoulos, 866 F.2d 587, 597 (3d Cir.) ("Since the jury's general verdict does not reveal which of the guns the jury had concluded [the defendant] had used during the conspiracy, [the court] can uphold the verdict only if all of those firearms can be deemed to have been used in the cocaine trafficking conspiracy."), mandamus denied sub. nom. Re Theodoropoulous, 489 U.S. 1009 (1989).
 
 C. Duplicitous Charges in Indictment
 
 46
 Dobson contends that both counts of his indictment charge multiple offenses and thus the indictment should have been dismissed or the court should have granted his motion to require the government to elect which offense in each count it would pursue. "An indictment is duplicitous when it joins in a single count two or more distinct and separate offenses." United States v. Robinson, 651 F.2d 1188, 1194 (6th Cir.) (citations omitted), cert. denied, 454 U.S. 875 (1981). Dobson argues that Count II, supra, charged both aiding and abetting with the use of the guns in the Cadillac and the use of the gun in his own car. "The vice of duplicity is that a jury may find a defendant guilty on the count without having reached a unanimous verdict on the commission of any particular offense." Id. (citation omitted). The offense listed in Count II is the use of a firearm in relation to a drug trafficking crime. While Count II lists several firearms, it lists only one offense for which a jury could find a defendant guilty. Because, as we noted above, Dobson could reasonably be linked to all three firearms, Count II is therefore not duplicitous.
 
 
 47
 Second, Dobson argues that Count I charges both conspiracy and attempt. Count I states that Stacy, Engle, and Dobson "knowingly and intentionally did conspire together and with each other, and with divers[e] other persons known and unknown, to commit federal drug offenses proscribed under Title 21 ... that is, they did attempt to possess and conspire to possess marijuana ... with the intent to distribute it."
 
 
 48
 While Count I is not a model of clarity, the first part lists the actual crime for which Dobson was being indicted: conspiracy. The second part, which lists both conspiracy and attempt, is merely surplusage. That part inelegantly attempted to explain the underlying crimes for which the conspiracy was based, but it is clear that conspiracy is the only crime actually charged and tried in this count.
 
 IV.
 
 49
 The district court calculated both Dobson's and Engle's guideline level based upon fifty pounds of marijuana, the amount they agreed to purchase on the day they were arrested. Dobson and Engle argue that since they had only $39,000 available to them, they should only have been sentenced based upon the thirty-nine pounds that they could have purchased.
 
 According to the Sentencing Guidelines:
 
 50
 If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.
 
 
 51
 U.S.S.G. § 2D1.4, comment. (n. 1). Engle and Dobson point out that the Presentence Investigation Report notes that neither defendant had the financial ability to raise significant amounts of money. Thus, they assert that because $39,000 was all they could come up with, they were not "reasonably capable of producing" the $50,000 necessary to buy the full fifty pounds of marijuana for which they were sentenced.
 
 
 52
 Defendants carry the burden of proof to show that they could not have purchased the negotiated amount. United States v. Christian, 942 F.2d 363, 368 (6th Cir.1991), cert. denied, 112 S.Ct. 905 (1992). The sale negotiated was for $50,000 and, at the time of the transaction, Stacy claimed that he had the balance of the money but could not get it because his bank was closed. Defendants failed to provide evidence that they were not capable of producing the extra $11,000.
 
 V.
 
 53
 For the reasons stated above, the orders and sentences of the district court are affirmed.
 
 
 
 *
 The Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [2]
 The Application Notes go on to explain that:
 It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.
 U.S.S.G. § 3B1.2, comment. (n. 2).
 
 
 [3]
 Dobson argues that his brother had accidently left the gun in the car and that he did not intend the gun to have any role in the drug transaction